IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | Crim. No. 1:19-CR-00216 |
| | : | |
| v. | : | |
| | : | |
| DEVARES VICK | : | Judge Sylvia H. Rambo |

## M E M O R A N D U M

Presently before the court are Defendant Devares Vick's objections (Doc. 79) to Magistrate Judge Martin C. Carlson's Report and Recommendation ("R&R") which recommends that the Court deny the Defendant's Motion to Suppress Evidence. (Doc. 27). For the reasons set forth below, the Court will adopt the R&R.

## I.  PROCEDURAL BACKGROUND

The pending motion to suppress stems from a traffic stop of Defendant's vehicle conducted by Officer Shayne Barber ("Officer Barber") on May 29, 2019. (Doc. 66, at 10-11). Defendant filed a motion to suppress evidence obtained as a result of the stop on March 24, 2020 (Docs. 27, 28), which the Court referred to Magistrate Judge Carlson on May 21, 2020. (Doc. 35). The Magistrate Judge held an evidentiary hearing on the motion on September 11, 2020. (Doc. 57). After the hearing, the Magistrate Judge issued an R&R in which he recommended that the Court deny the motion to suppress. (Doc. 79). Defendant filed timely objections to the R&R on January 5, 2021 (Doc. 80), and the Government responded on February 23, 2021. (Doc. 86). This matter is thus ripe for disposition.

## II. FACTUAL BACKGROUND

After a de novo review of the record, the court adopts the R&R's thorough statement of the facts with limited exception. (Doc. 79, at 2-5). On May 29, 2019, at approximately 3:30 A.M., Officer Barber of the Lower Paxton Township Police Department stopped a vehicle in which Defendant was a passenger. (Doc. 66, at 11). Prior to conducting the traffic stop, Officer Barber witnessed the vehicle back out of a Sunoco parking lot, pull out in front of him upon turning right at North Mountain Road, and then immediately turn back into the gas station. (Id. at 13). Officer Barber, who was operating an unmarked Ford Explorer at the time, turned into the gas station directly behind the vehicle. (Id. at 14). The vehicle then promptly pulled out of the parking lot and proceeded to the intersection of North Mountain Road and Allentown Boulevard.[1] (Id. at 10). Officer Barber followed the vehicle, which continued to a

---

[1] Defendant objects to the R&R's finding that Officer Barber observed "suspicious behavior" before he initiated the traffic stop. (Doc. 80, at 3). In support of this objection, Defendant claims that Officer Barber did not witness anything illegal at this point in time. Defendant further claims that it was impossible for either him or the female driver to have been aware of Officer Barber's presence until the stop occurred, as Officer Barber first noticed their vehicle from approximately 200 yards away, operated an unmarked police unit, and only momentarily stopped behind the vehicle before it exited the gas station. Officer Barber even testified there was no indication that the vehicle's occupants realized he was a police officer when they initially backed out of the Sunoco. (Doc. 66, at 46).

However, once the vehicle pulled out in front of Officer Barber's approaching unit, it immediately turned back into the gas station. (Id. at 13). Officer Barber stated that when he pulled up behind the vehicle, he was only a couple of feet away and no other vehicles were present in the parking lot. (Id.) Although Officer Barber's vehicle did not display any police decals on its exterior, its municipal license plates, spotlight, and visible lightbars provided other indications that the car was used for law enforcement. (Id. at 46). Further, once the car proceeded to turn back onto North Mountain Road, Officer Barber testified that he believed the occupants were "trying to avoid [him] at this point." (Id. at 16, 49). Accordingly, the record

2

left turn only lane at the intersection. (Id. at 15). Once the light changed from red to green, however, the vehicle travelled straight through the light in violation of Pennsylvania's motor code.[2] (Id. at 17). Upon observing this traffic violation, Officer Barber pulled the vehicle over and initiated a traffic stop. (Id.)

Officer Barber approached the vehicle on the passenger side, as this side of the vehicle did not face the street. (Id. at 20). He then observed a female ("Ms. Weikel")[3] in the driver's seat and the Defendant, who appeared to be sleeping, in the front passenger's seat. (Id. at 22). When Officer Barber started to explain why he initiated the stop, Ms. Weikel immediately began to say "I need to go to the bathroom, I need to use the restroom, and I need to get home to my kids." (Id. at 22). Officer Barber characterized her behavior as nervous,[4] as she appeared "fidgety" and

---

    supports the finding that Officer Barber observed the vehicle engage in suspicious behavior leading up to the traffic stop, and the Defendant's objection will be overruled.

[2] 75 Pa. Cons. Stat. § 3111(a) (obedience to traffic control device) (Doc. 61, at 2).

[3] Although the female driver eventually identified herself to Officer Barber as "Rhonda Davila," her actual name was Amanda Weikel.(Doc. 61, at 6).

[4] Defendant objects to the R&R's finding that Officer Barber described Ms. Weikel as behaving "erratically." (Doc. 80, at 6). Rather, Defendant points out that Officer Barber testified Ms. Weikel behaved "almost as if she was ecstatic." (Doc. 66, at 22). Defendant further argues that Ms. Weikel's conduct, characterized by the R&R as erratic, excessively nervous, animated, and agitated, does not weigh in favor of finding reasonable suspicion existed. (Doc. 80, at 8).
    Upon review of the record, the Court finds that Defendant merely objects to the word choice employed by the Magistrate Judge. Although Officer Barber indicated that Ms. Weikel behaved in an "ecstatic" manner, when read in context with his other observations, the Court is not persuaded that clarifying her conduct as erratic impacts the accuracy of the R&R's factual recitation. Additionally, as Officer Barber specifically explained that she was "all over the place talking with her hands," frequently adjusting her shirt and other items for no apparent reason, and speaking very fast, the Court does not agree with the Defendant's argument that

3

provided various reasons for Officer Barber to terminate the encounter in a non-stop fashion. (Id. at 59). Officer Barber asked Ms. Weikel why she declined to use the bathroom at the Sunoco gas station, but she failed to provide him with a clear response.[5] (Id. at 22-24). Officer Barber then generally inquired as to their itinerary, and Ms. Weikel stated that they had come from a two-day trip in the Poconos. (Id. at 24). When Officer Barber initially asked why there was no luggage in the vehicle, Ms. Weikel responded that they didn't need any luggage.[6] (Id. at 27, 58).

---

Ms. Weikel's behavior fails to reflect nervousness or agitation. (Doc. 66, at 59, 89-90). Defendant's objections to these factual findings will therefore be overruled.

[5] Defendant objects to the R&R's finding that, upon being asked why she did not use the restroom at the gas station, the female driver did not respond to Officer Barber's inquiry. (Doc. 80, at 3-4). As noted by Defendant, Officer Barber testified that the driver stated "something about going to Sheetz," even though the initial police report indicated that she provided him with no reason. (Doc. 61, at 3; Doc. 66, at 23). Insofar as it can be inferred that Ms. Weikel's statement regarding Sheetz was in response to Officer Barber's question about declining to use the restroom at Sunoco, the Defendant's objection is sustained. However, the Court does not agree that this impacts Officer Barber's credibility; specifically, Officer Barber explained that he was not persuaded by Ms. Weikel's statement because she had been travelling in the opposite direction of Sheetz. (Doc. 66, at 23-24, 62). Accordingly, the Court finds Officer Barber's assessment of Ms. Weikel's response to be reasonable and will overrule the Defendant's objection regarding credibility.

[6] Defendant asserts that the R&R did not adequately address Officer Barber's misstatements regarding when he became aware of the lack of luggage in the interior of the Defendant's vehicle. (Doc. 80, at 4-6). Specifically, Defendant points to Officer Barber's police report, which suggests that he had a conversation with Ms. Weikel regarding the absence of luggage after Corporal Miller had already arrived on the scene. (Doc. 61, at 3-4, 7). During the suppression hearing, Officer Barber indicated that he independently observed a lack of luggage in the vehicle when Ms. Weikel stated that she and Defendant had been on a trip to the Poconos. (Doc. 66, at 58). He additionally testified that he engaged in a conversation with Ms. Weikel about the luggage before he called upon Corporal Miller. (Id. at 57). When asked about whether his police report accurately reflected this sequence of events, Officer Barber clarified:

> [The police report is] just written -- it's just not written the best. When I wrote -- when it says here, when she first stated they did not need any [luggage], that's me writing that she said they didn't need any when I first talked to her about it.

4

Officer Barber subsequently requested Ms. Weikel's identification, but she could not immediately provide any.[7] (Id. at 27). Officer Barber also requested identification from the Defendant, who produced a North Carolina drivers license. (Id. at 27, 113). Officer Barber ran an identification check on the driver's license and subsequently discovered that Defendant was on federal probation.[8] (Id. at 28-29). Ms. Weikel eventually showed Officer Barber a photo of a license on her cell phone under the name Rhonda Davila. (Id. at 28). When Officer Barber ran an identification check on the Davila license he found no outstanding warrants. (Id. at 86).

---

      The next sentence says, 'I again asked her the same question,' meaning while I'm with Corporal Miller, I again asked her the same question, and that's when she stated it was at her mother's house. (Id. at 69).

  The Court therefore disagrees with Defendant, as the record supports that Officer Barber noticed the lack of luggage, and questioned Ms. Weikel on the subject, prior to contacting Corporal Miller.

[7] Defendant asserts that the Magistrate Judge erred in finding that Ms. Weikel did not have a driver's license or could not produce one when asked. (Doc. 80, at 7). This objection will be overruled, as the R&R indicated that Ms. Weikel eventually showed Officer Barber a photo of a driver's license on her phone. (Doc. 66, at 28). Although this license was issued to a "Rhonda Davila," Officer Barber did not come to discover Ms. Weikel's true identity until after she was arrested and fingerprinted. (Id. at 63, 86; Doc. 61, at 6).

[8] Defendant lodges an objection insofar as the R&R failed to clarify when Officer Barber first learned of Defendant's supervised release status. (Doc. 80, at 6-7). Defendant asserts that Officer Barber discovered Defendant was on supervised release only after he had asked Corporal Miller to respond at the scene with a K-9 unit. (Id.) Corporal Miller's police report additionally suggests that this discovery was made after he had responded to Officer Barber's request for assistance. (Doc. 61, at 7).
    The R&R found that county control informed Officer Barber of the Defendant's supervised release status after he ran an identification check of Defendant's license, which contributed to Officer Barber's reasonable suspicion. (Doc. 79, at 12). However, the R&R also concluded that Officer Barber had reasonable suspicion that criminal activity was afoot even before the discovery of Defendant's federal probation. (Id. at 14). Nonetheless, for the sake of clarification, the Court will sustain Defendant's objection.

By this time, Officer Barber had asked for Corporal Miller, a K-9 officer, to respond to the scene. (Id. at 30). Officer Barber testified that it took approximately ten minutes for Corporal Miller to arrive. (Id.) Once he did, Officer Barber briefed Corporal Miller on the reasons why he believed reasonable suspicion existed. (Id.; Doc. 61 at 7). Officer Barber and Corporal Miller then asked Ms. Weikel to exit the car in order to review her travel plans with her. (Doc. 66, at 31). Ms. Weikel explained that she and the Defendant were travelling to Harrisburg to pick up her luggage from her mother's house, which was inconsistent with her previous statement that she did not need luggage. (Id. at 32).

The Officers then spoke with the Defendant separately, who remained seated in the car. (Id. at 32). Contrary to what Ms. Weikel had described, Defendant indicated that they had been in the Poconos for one day to assist friends. (Id. at 32-33). Defendant additionally stated that he and Ms. Weikel were driving straight to North Carolina and were not stopping at her mother's house to pick up luggage.[9] (Id. at 33). Officer Barber subsequently asked Defendant to get out of the vehicle and patted him down for weapons. (Id. at 34-36). At this point, Officer Barber testified

---

[9] In his objections, Defendant submits that Officer Barber did not learn of the inconsistent travel plans provided by Defendant and Ms. Weikel until after he contacted the K-9 officer. (Doc. 80, at 9). Based on a de novo review of the record, the Court finds this clarification to be well founded.

6

that he "a hundred percent believed that there was criminal activity present." (Id. at 34).

Corporal Miller proceeded to walk his K-9 unit around the car, and the dog alerted to the presence of narcotics in several locations, including the trunk. (Id. at 36). Thereafter, Officer Barber searched the trunk of the car and discovered two bags that, when weighed in total, contained about one kilogram of a substance that was later confirmed to be cocaine. (Id. at 48). Defendant was placed under arrest and searched, during which $2,467.00 in cash was found on his person. (Doc. 66, at 38). Defendant seeks to suppress this evidence based on alleged violations of his Fourth Amendment rights. (Doc. 27).

### III. STANDARD OF REVIEW

The Federal Magistrate Act authorizes a district judge to refer a pretrial motion—including a motion to suppress—to a magistrate judge to hold a hearing and to prepare and submit an R&R for the disposition of the motion. 28 U.S.C. § 636(b)(1)(B). If an objection is filed to the R&R, the court must conduct a *de novo* review of those portions of the R&R to which objections are made. 28 U.S.C. § 636(b)(1). Although a *de novo* review does not require the court to rehear witnesses whose testimony has been evaluated by the magistrate judge, it does require the court to independently consider factual issues based on the record. See United States v. Raddatz, 447 U.S. 667, 675-76 (1980). This *de novo* review requires the court to re-

examine all the relevant evidence previously reviewed by the magistrate judge to determine whether the recommendation should be accepted, rejected, or modified in whole or in part. FED. R. CRIM. P. 59(b)(3). The court may receive further evidence, if desired. Id. However, an objection that does nothing more than state a disagreement with a magistrate judge's suggested resolution or merely restates the arguments previously presented is not an "objection" as that term is used in this context, and is not entitled to *de novo* review.

Additionally, the Fourth Amendment to the United States Constitution grants individuals the right "to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." As the United States Supreme Court has repeatedly held, "[t]he touchstone of the Fourth Amendment is reasonableness." Florida v. Jimeno, 500 U.S. 248, 250 (1991). "Generally for a seizure to be reasonable under the Fourth Amendment, it must be effectuated with a warrant based on probable cause." United States v. Robertson, 305 F.3d 164, 167 (3d Cir. 2002) (citing Katz v. United States, 389 U.S. 347, 356-57 (1967)).

"The proponent of a motion to suppress has the burden of establishing that his own Fourth Amendment rights were violated by the challenged search or seizure." Rakas v. Illinois, 439 U.S. 128, 130 n.1 (1978) (citing Simmons v. United States, 390 U.S. 377, 389–90 (1968)). The government, however, "bears the burden of showing that each individual act constituting a search or seizure under the Fourth

Amendment was reasonable." United States v. Ritter, 416 F.3d 256, 261 (3d Cir. 2005). "The applicable burden of proof is by a preponderance of the evidence." United States v. Matlock, 415 U.S. 164, 177 n.14 (1974).

IV. **DISCUSSION**

In his first objection to the R&R, Defendant challenges the Magistrate Judge's conclusion that reasonable suspicion existed to perform a brief investigatory stop. (Doc. 80, at 1). Specifically, Defendant asserts that Officer Barber immediately turned the traffic stop into an investigatory detention, as there was no reasonable suspicion to detain Defendant. (Id.) Defendant also objects to the R&R insofar as it failed to identify when the "Rodriguez moment" occurred. (Doc. 80, at 2). Finally, Defendant objects to any deference that the R&R paid to Officer Barber's law enforcement experience and the implicit assessment of his credibility. The Court will address each issue in turn.

a. **Whether Reasonable Suspicion Existed at the Rodriguez Moment**

The gravamen of Defendant's objections is whether Officer Barber unreasonably extended the May 29, 2019 traffic stop in violation of Defendant's Fourth Amendment rights. "[A] seizure that is lawful at its inception can violate the Fourth Amendment if its manner of execution unreasonably infringes interests protected by the Constitution." Illinois v. Caballes, 543 U.S. 405, 407 (2005). Indeed, "[i]f a seizure or detention is extended beyond what was authorized by the

9

initial reasonable suspicion or probable cause, that extended seizure is unconstitutional absent additional reasonable suspicion of criminal activity." Davila v. N. Reg'l Joint Police Bd., 370 F. Supp. 3d 498, 514 (W.D. Pa. 2019) (citing Rodriguez v. United States, 575 U.S. 348 , 350 (2015) ("[A] police stop exceeding the time needed to handle the matter for which the stop was made violates the Constitution's shield against unreasonable seizures."). Simply stated, "[a]n unreasonable extension occurs when an officer, without reasonable suspicion, diverts from a stop's traffic-based purpose to investigate other crimes." United States v. Green, 897 F.3d 173, 179 (3d Cir. 2018) (citing Rodriguez, 575 U.S. at 355).

Generally, a lawful seizure "ends when tasks tied to the traffic infraction are—or reasonably should have been—completed." Rodriguez, 575 U.S. at 354. Such tasks include "checking the driver's license, determining whether there are outstanding warrants against the driver, and inspecting the automobile's registration and proof of insurance." Id. at 355. The United States Court of Appeals for the Third Circuit has also held that "some questions relating to a driver's travel plans ordinarily fall within the scope of the traffic stop, as do delays caused by safety concerns related to the stop." United States v. Garner, 961 F.3d 264, 271 (3d Cir. 2020) (citing United States v. Givan, 320 F.3d 452, 459 (3d Cir. 2003). The "Rodriguez moment," which is often "far easier to articulate than apply," thus occurs once an officer extends a traffic stop beyond its original mission. Green, 897 F.3d at 179.

10

As the Defendant points out, the R&R does not expressly identify when the Rodriguez moment occurred. However, the Magistrate Judge found that Officer Barber did not unnecessarily prolong the traffic stop in order to wait for Corporal Miller, as Officer Barber conducted routine traffic stop checks during that ten-minute period of time.[10] Defendant argues that the stop was immediately extended upon Officer Barber's questioning of Ms. Weikel for reasons unrelated to the traffic violation. (Doc. 80, at 2). The Government responds that the traffic mission, for the purposes of Rodriguez, could not have been reasonably completed until after Officer Barber obtained Ms. Weikel's driver's license, confirmed its validity, and ran it for outstanding warrants. (Doc. 86, at 5).

The R&R correctly explained that an investigative detention, in contrast to an arrest that requires probable cause, is governed by the reasonable suspicion standard. See United States v. Valentine, 232 F.3d 350, 353 (3d Cir. 2000). Although reasonable suspicion demands that an officer possess more than an "unparticularized suspicion or 'hunch'" of criminal activity, it requires a showing "considerably less

---

[10] Defendant further argues that the R&R ultimately found the duration of the traffic stop amounted to a *de minimis* intrusion, which is not an exception to rule set forth in Rodriguez. (Doc. 80, at 8). The Court is not persuaded by this contention, however, as Officer Barber continued to conduct an investigation related to the stop while he waited for Corporal Miller to respond. Cf. Arizona v. Johnson, 555 U.S. 323, 333 (2009) (holding that if an unrelated investigation "measurably extend[s] the duration of the stop," then the seizure is unlawful unless the officer possesses another basis of reasonable suspicion or probable cause). Accordingly, as the Court agrees with the finding that detaining Defendant during this ten minute time frame did not measurably or unreasonably lengthen the stop, Defendant's objection will be overruled.

11

than proof of wrongdoing by a preponderance of the evidence." Garner, 961 F.3d at 271 (quoting Terry v. Ohio, 392 U.S. 1, 27 (1968); United States v. Sokolow, 490 U.S. 1, 7 (1989)). Further, in assessing an officer's reasonable suspicion determination, courts must consider "the totality of the circumstances." Green, 897 F.3d at 183. As such, "reasonable suspicion cannot be defeated by a so-called 'divide-and-conquer' analysis, whereby each arguably suspicious factor is viewed in isolation and plausible, innocent explanations are offered for each." Id.

Here, upon de novo review of the record, the Court finds that the Rodriguez moment occurred upon the completion of running Ms. Weikel's driver's license through county control, which was the last task incident to the purpose of the traffic stop. At that point in time, the record supports the Magistrate Judge's conclusion that Officer Barber possessed reasonable suspicion to extend the stop. Even if the Rodriguez moment occurred earlier, specifically once Officer Barber requested Corporal Miller's assistance at the scene, the Court still agrees with the finding that reasonable suspicion existed based on the vehicle's evasive driving at approximately 3:30 in the morning, Ms. Weikel's nervous behavior upon being stopped, her inability to initially provide Officer Barber with identification, and the visible lack of luggage for a long-distance trip. When viewed in totality, Officer Barber's observations—which were later bolstered by the inconsistent itineraries provided and the discovery that Defendant was on supervised release—warranted extending

the stop until Corporal Miller arrived and thus did not infringe upon the Defendant's Fourth Amendment rights.

Therefore, as Officer Barber did not impermissibly exceed the scope of the traffic stop without a reasonable, particularized suspicion that Defendant had engaged in criminal activity, the Court will overrule Defendant's objections.

### b. Deference Afforded to Officer Barber

Insofar as the R&R determined that Officer Barber's police training informed his reasonable suspicion analysis, Defendant objects to this finding. (Doc. 80, at 2). Specifically, Defendant asserts that Officer Barber lacked demonstrable police experience in drug interdiction or drug-related traffic stops. Accordingly, Defendant contests whether Officer Barber was entitled to the same deference afforded to experienced police officers upon making his reasonable suspicion determination.

As the R&R correctly noted, the United States Court of Appeals for the Third Circuit has advised that "[w]e afford significant deference to a law enforcement officer's determination of reasonable suspicion." United States v. Torres, 961 F.3d 618, 623 (3d Cir. 2020) (citing United States v. Foster, 891 F.3d 93, 104 (3d Cir. 2018)). Indeed, when assessing whether reasonable suspicion existed leading up to a defendant's seizure, courts must consider the totality of circumstances, "including the police officer's knowledge, experience, and common-sense judgements about human behavior." Foster, 891 F.3d at 105 (quoting United States v. Robertson, 304

F.3d 164, 167 (3d Cir. 2002). Here, Officer Barber testified that, relative to the May 29, 2019 traffic stop, he had over three-years of experience as a police officer in the Lower Paxton Township Police Department. (Doc. 66, at 42). Officer Barber further indicated that he had received brief training in drug interdiction at the Northeast Counterdrug training facility. (Id. at 9, 43-44). Although the R&R did not specifically credit Officer Barber's law enforcement experience, it found that the totality of the available evidence "in context and with common sense . . . gave rise to a reasonable suspicion that there was criminal activity afoot." (Doc. 79, at 12). Accordingly, to the extent the Magistrate Judge considered Officer Barber's police background and "common sense judgments" in totality with the other information before him, the Court finds that this was not in error. The Defendant's objection in this regard will therefore be overruled.

### c. The Implicit Credibility Assessment of Officer Barber

Finally, Defendant objects to the R&R's implicit finding regarding the credibility of Officer Barber's testimony. (Doc. 80, at 9). In support, Defendant points to the contradicting nature of his police report surrounding the traffic stop and the testimony he provided at the suppression hearing. The Government asserts that Defendant simply disagrees with the Magistrate Judge's in-court assessment of Officer Barber's credibility, which should not warrant a new suppression hearing. (Doc. 86, at 2, 6-7).

Although the court agrees that the R&R implicitly recognized the credibility of Officer Barber, it finds no reason to depart from the Magistrate Judge's assessment of his testimony. Upon de novo review, the court is convinced that the Magistrate Judge's thorough factual findings and legal conclusions are well-founded in the record. See Hill v. Beyer, 62 F.3d 474, 482 (3d Cir. 1995) ("Our judicial system affords deference to the finder of fact who hears the live testimony of witnesses because of the opportunity to judge the credibility of those witnesses.") (citing Louis v. Blackburn, 630 F.2d 1105, 1109 (5th Cir. 1980)); Blizzard v. Quillen, 579 F. Supp. 1446, 1449 (D. Del. 1984) ("[T]he credibility findings of a magistrate, who personally observed and listened to the testimony of live witnesses, may be accepted unless the district judge, in [her] de novo review, finds reason to question the magistrate's assessment of the evidence."). Accordingly, as the court finds that the Magistrate Judge properly credited Officer Barber's testimony, the Defendant's objection will be overruled.

## V. **CONCLUSION**

For the reasons set forth above, Defendant's motion to suppress will be denied. An appropriate order shall follow.

*/s/ Sylvia H. Rambo*
SYLVIA H. RAMBO
United States District Judge

Dated: May 3, 2021